### UNITED STATES DISTRICT COURT
### DISTRICT OF MAINE

| | | |
|---|---|---|
| **JAY CASHMAN, INC.,** | ) | |
| | ) | |
| **Plaintiff** | ) | |
| | ) | |
| **v.** | ) | **Civil No. 07-93-P-H** |
| | ) | |
| **PORTLAND PIPE LINE CORP.,** | ) | |
| | ) | |
| **Defendant** | ) | |

### MEMORANDUM DECISION ON PLAINTIFF'S MOTIONS IN LIMINE AND RECOMMENDED DECISION ON DEFENDANT'S MOTION FOR PARTIAL SUMMARY JUDGMENT

Portland Pipe Line Corp. ("Pipeline") moves for summary judgment in its favor on three of the five counts of the complaint filed against it by Jay Cashman, Inc. ("Cashman"). In its complaint, Cashman seeks additional compensation for dredging work it performed for Pipeline in the Portland Harbor Channel. *See generally* Defendant's Motion for Partial Summary Judgment ("Defendant's S/J Motion") (Docket No. 27); Complaint (Jury Trial Demanded) ("Complaint") (Docket No. 1). In addition, Cashman seeks, via five motions in *limine*, to exclude evidence it anticipates Pipeline will offer against it. *See* Plaintiff Jay Cashman Inc.'s Motion in *Limine* To Exclude Evidence Including Expert Opinion Testimony Concerning [Cashman's] Hydrographic Surveying ("*Limine* Motion/Surveying") (Docket No. 28); Jay Cashman Inc.'s Motion in *Limine* To Exclude Evidence of Settlement Negotiations ("*Limine* Motion/Settlement") (Docket No. 29); Plaintiff Jay Cashman, Inc.'s Motion in *Limine* To Exclude Evidence of Third-Party Insurance Claim ("*Limine* Motion/Insurance") (Docket No. 30); Plaintiff Jay Cashman Inc.'s Motion in *Limine* To Limit the Testimony of Defendant's Expert Edward Geoff Webster ("*Limine* Motion/Webster") (Docket No.

31); Plaintiff Jay Cashman Inc.'s Motion in *Limine* To Exclude Any Evidence To Clarify the Terms of the Contract Where the Contract Is Not Ambiguous ("*Limine* Motion/Contract Terms") (Docket No. 32).  With the benefit of oral argument held before me on May 13, 2008, addressing all six motions, I defer ruling until trial on three of the motions in *limine* (the *Limine* Motion/Settlement, the *Limine* Motion/Insurance, and the *Limine* Motion/Webster), grant the *Limine* Motion/Contract Terms, deny the *Limine* Motion/Surveying, and recommend that the court grant the Defendant's S/J Motion as to Counts III (unjust enrichment) and V (unconscionability and breach of the duty of good faith and fair dealing) and deny it as to Count II (*quantum meruit*).

## I.  Motions in *Limine*

At oral argument, counsel for Cashman sought postponement of the court's ruling until trial on three of its pending motions in *limine*, the *Limine* Motion/Settlement, the *Limine* Motion/Insurance, and the *Limine* Motion/Webster.  Counsel for Pipeline lodged no objection to that request.  Accordingly, ruling on those motions is reserved until trial.  Pipeline's counsel also advocated for postponement of a ruling on Cashman's remaining two motions in *limine*, the *Limine* Motion/Contract Terms and the *Limine* Motion/Surveying, in view of the complexity of the contract and the record in this case, and the parties' sharp divergence on the motions' merits.  Counsel for Cashman rejoined that the motions could and ought to be adjudicated and that their prompt resolution would assist counsel in preparing for trial.  I agree with Cashman and accordingly address the merits of those two motions.

### A.  *Limine* Motion/Contract Terms

In its motion in *limine* concerning contract terms, Cashman in effect asks the court to declare that the parties' contract unambiguously (i) incorporated the standards of the United States Army Corps of Engineers Hydrographic Manual, Class 1, EM 1110-2-1003, October 1994 ("1994

Manual"), including the manual's direction that hydrographic surveyors build a half-foot tolerance, or leeway, into measurements in so-called "Class I" surveys, and (ii) fixed mean lower low water ("MLLW") as the standard by which Cashman's performance was to be measured, without reference to a bronze disk on Pipeline's Pier No. 2 that Pipeline contends the parties agreed would serve as the benchmark, or "contract datum," for measurement of Cashman's progress on the project. *See generally Limine* Motion/Contract Terms; Plaintiff Jay Cashman, Inc.'s Reply to Defendant's Opposition to Plaintiff's Motion in *Limine* To Exclude Any Evidence To Clarify the Terms of the Contract Where the Contract Is Not Ambiguous ("*Limine* Reply/Contract Terms") (Docket No. 52).

Cashman initially anticipated that Pipeline would "attempt to argue at trial that some of the contract's provisions are subject to several interpretations or that they are meaningless." *Limine* Motion/Contract Terms at 1. Pipeline clarified that it makes no such argument; rather, its position is that the contract unambiguously did *not* incorporate a half-foot measurement tolerance and unambiguously fixed the bronze disk as the benchmark from which Cashman's performance was to be measured. *See generally* Defendant's Opposition to Plaintiff's Motion in *Limine* To Exclude Evidence To Clarify or Explain the Terms of the Contract ("*Limine* Opposition/Contract Terms") (Docket No. 41). Pipeline seeks denial of the motion on the bases that (i) its interpretation of the contract alone is reasonable and, (ii) alternatively, should the court find both parties' interpretations reasonable (and the contract therefore ambiguous), it is entitled to present extrinsic evidence clarifying the parties' intent. *See id*. at 1.

The parties see eye to eye on most of the operative legal constructs. They agree that (i) whether a contract term is ambiguous is a question of law for the court, (ii) if a term is unambiguous, its meaning should be derived from within the four corners of the contract, and (iii) if contract terms lend themselves to more than one reasonable interpretation, those terms are

ambiguous.  *Compare Limine* Motion/Contract Terms at 2 *with Limine* Opposition/Contract Terms at 3; *see also, e.g., Triple-A Baseball Club Assocs. v. Northeastern Baseball*, *Inc.*, 832 F.2d 214, 220 (1st Cir. 1987); *Portland Valve, Inc. v. Rockwood Sys. Corp*., 460 A.2d 1383, 1387 (Me. 1983). However, the parties diverge on what results if the court finds an ambiguity.  Cashman urges the court to construe any ambiguous terms against the contract's drafter (Pipeline), *see Limine* Motion/Contract Terms at 6; Pipeline says the parties should be permitted to introduce extrinsic evidence to clarify any ambiguity, *see Limine* Opposition/Contract Terms at 3.  Pipeline has the better argument.  *See Tinker v. Continental Ins. Co.*, 410 A.2d 550, 553-54 (Me. 1980) ("Where contractual language at issue in a case is ambiguous in its meaning, and the ambiguity cannot be resolved by looking to the internal language of the contract as a whole, extrinsic evidence may be considered to assist in interpreting the meaning of the language at issue as the expression of the intent of the parties. . . .  The rule of strict construction, therefore, is a rule of last resort which must not be permitted to frustrate the intention the parties have expressed, if that can otherwise be ascertained.").

### 1.  1994 Manual

The parties' contract included a twenty-page Supplemental Schedule 1, Scope of Work ("SOW").  *See* SOW, Exh. A to *Limine* Motion/Contract Terms.  The SOW described the job at issue as follows:

> [Pipeline or "Company"] owns and operates a crude oil receiving pier (Pier 2) and storage terminal in South Portland, Maine, that receives petroleum from ocean-going tankers.  The Company proposes to deepen the federally designated Portland Harbor Approach Channel (referred to herein as "the Channel") and the approach to Pier 2 from the Channel (referred to herein as "the Transition Area") to the performance limits (-48 feet MLLW or -50 feet MLLW) to accommodate larger vessels as shown on the contract Exhibits and Drawings.  The portions of the Channel and the Transition area designated for dredging to the performance limits, as shown on the contract drawings (see **0103 – List of Drawings**), are collectively referred to herein as the Project Area.

4

*Id*. at 1, § 0102.[1]  The project goal was "to dredge the Project Area . . . to the performance limits as shown on the Contract Drawings and Exhibits and as defined herein."  *Id*.  Section 0103 of the SOW listed approximately a dozen drawings "generated to define the scope of work" and "considered part of the Contract Documents[,]" among them "OSI Drawings of the acoustic basement; July 31, 2002."  *Id*. at 2, § 0103.  The SOW also contained the following relevant provisions:

**0254 – Physical Data**

The physical conditions indicated on the drawings and in the specifications are the result of site investigations by multi-beam hydrographic surveys, acoustic Doppler current profiling and/or sampling and physical and/or chemical testing of channel sediments or rock deposits.  The surveys were conducted in accordance with the USACOE Hydrographic Manual, Class 1, EM 1110-2-1003, October 1994.

***

**1026 – Responsibility for Post-Dredge Surveys**

The Company will conduct the post-dredge hydrographic surveys in accordance with Section 1027.  The Company is responsible for the cost of one post-dredge survey that successfully demonstrates that the Contractor has satisfactorily completed the work to the performance limits.  Any additional survey work conducted by the Contractor shall be at the Contractor's expense.  In the event that the Company-conducted post-dredge surveys identify areas of the work that have not been satisfactorily completed to the performance limits, the Contractor shall re-dredge the affected areas to the performance limits and will be responsible for the cost of the subsequent re-surveys by the Company to determine attainment of the performance limits.  The cost of any such re-surveys will be deducted from the payments to the Contractor.

---

[1] Pipeline sought bids on two alternative jobs, one to dredge to minus 48 feet MLLW generally and minus 49 feet MLLW in bedrock and till areas and the other to dredge to minus 50 feet MLLW generally and minus 51 feet in bedrock and till areas.  *See* SOW at 5, § 0230.  The parties agreed on the first alternative.  *See Limine* Opposition/Contract Terms at 4; *Limine* Reply/Contract Terms at 6.

**1027 – Requests for Post-Dredge Surveys**

. . .  The post-dredging hydrographic surveys will employ comparable equipment and techniques to those employed during the pre-dredging hydrographic survey (see **0254 – Physical Data**).

*Id.* at 6, 19, §§ 0254, 1026-27.

The 1994 Manual states that its intent "is to establish definitive standards along with survey performance and procedural policy which will ensure uniform and accurate hydrographic surveying products.  This will reduce costly errors, enhance the equitability of contracted construction administration, and increase the overall quality and safety of Corps projects."  1994 Manual, Exh. D to *Limine* Reply/Contract Terms, at [1].  The manual contains a chapter on depth measurement systems containing specifications that "are intended to produce depth measurement accuracies which do not exceed ± 0.5 ft. for Class 1 . . . surveys."  *Id.* at 8-1.  In an accompanying table, "General Depth Measurement Criteria," the manual instructs surveyors using echo sounding systems (which include "multi-beam swath systems") to evaluate depth to the nearest one-half foot.  *Id.* at Table 8-1.  It states: "For Class 1 surveys, individual depth measurements should be evaluated to the tolerance shown, not the level of resolution or precision by which they are measured/displayed (typically 0.1 ft)."  *Id.*

Cashman contends that, in representing that the pre-dredge surveys had been performed "in accordance with" the 1994 Manual and that the post-dredge surveys would be conducted using "comparable" equipment and techniques, the contract in effect contemplated adjustment of post-dredge measurements to a half-foot tolerance.  *See Limine* Reply/Contract Terms at 2-5.  This, in Cashman's view, constituted a fair and commercially reasonable measurement technique in circumstances in which achievement of perfection was "unjust and absurd" given inherent limitations in surveying methods and equipment.  *See id.* at 3-4.  As things played out, Cashman

complains, Pipeline and its surveyor, OSI,[2] ignored the 1994 Manual and held Cashman to a standard of virtual perfection, requiring redredging when OSI's surveys indicated Cashman's work was off by as little as one-tenth or one one-hundredth of a foot.  *See id*.[3]

Pipeline does not deny the applicability of the 1994 Manual to the pre-dredge surveys, or that the post-dredge surveys were to be completed using "comparable" survey methods.  *See Limine Opposition/Contract Terms at 5*.  However, it argues that (i) the contract specified that Cashman would dredge to the stated depths, with no measurement tolerance or payment allowance for overdredging, (ii) a prudent contractor would have planned to overdredge sufficiently to be sure it dredged to at least minus 48 and 49 feet MLLW, after taking into account any possible measurement tolerances, and (iii) "Cashman's attempt to imply a half foot leeway into the very specific contract standard, always in its own favor, is wholly unreasonable."  *Id*. at 4-5.[4]  It adds that, with respect to the 1994 Manual, Pipeline and OSI met the contract requirements because the 1994 Manual in effect "set a floor for the equipment and methodology to be used by OSI for the pre-dredge surveys, and OSI performed well above this floor."  *Id*. at 4.

---

[2] "OSI" is shorthand for Ocean Surveys, Inc., a company based in Old Saybrook, Connecticut.  *See* Exh. H to *Limine* Reply/Contract Terms.

[3] Cashman asserts in its papers, and its counsel contended at oral argument, that in conducting post-dredge surveying for this job, OSI, which prided itself on the sophistication of its technology and the accuracy of its surveys, ignored the 1994 Manual.  *See Limine* Motion/Contract Terms at 3 n.1; Deposition of Russell Watson ("Watson Dep."), Exh. D thereto, at 48; *Limine* Reply/Contract Terms at 3-4 & nn. 3-4; Watson Dep., Exh. E thereto, at 18, 20.  Pipeline does not dispute this but explains that (i) in 1994, multibeam hydrographic surveying was in its infancy, and the equipment and methodology used in the pre-dredge surveys in 2002 were more sophisticated than those envisioned by the 1994 Manual, (ii) while the 1994 Manual was the most up to date version available when the contract documents were created, it had become outmoded, even "archaic," with respect to multibeam hydrographic surveying by the time OSI performed pre-dredge surveying for the instant project in 2002, (iii) the standards and tolerances described in the 1994 Manual with respect to multibeam hydrographic surveying had been superseded in the field by the equipment and methodology used by OSI in its 2002 pre-dredge surveys, and (iv) OSI used post-dredge equipment and methods "comparable" to those it employed for its pre-dredge surveys in 2002.  *See Limine* Opposition/Contract Terms at 4; Watson Dep., attached thereto, at 15-16; Deposition of George Reynolds ("Reynolds Dep."), attached to *Limine* Opposition/Contract Terms, at 74-76.

[4] It is not clear that the 1994 Manual's measurement methodology, which calls for rounding to the *nearest* half-foot, *see* 1994 Manual at Table 8-1, necessarily favors Cashman in every instance.  Indeed, at oral argument, Pipeline's counsel contended that if Cashman had read and focused on the six-inch tolerance contained in the 1994 Manual, it should have made sure it dredged enough to meet performance standards within a half-foot (plus or minus) tolerance.  It may be, as Pipeline seems to suggest, that Cashman performed its dredging duties poorly even by the yardstick of the 1994 Manual, (*continued on next page*)

Cashman retorts, *inter alia*, that it "reasonably expected that its work would be judged by the 'floor' outlined in the 1994 Manual, not by the 'well above' the 'floor' standard of perfection created by OSI" and that, while Pipeline may now regret it chose to refer to the 1994 Manual, it "does not get a 're-do' because it now realizes that the contract language does not support what it did in the field." *Limine* Reply/Contract Terms at 5 (footnote omitted).

Pursuant to Maine law, "a contract is ambiguous only when its terms lend themselves to more than one *reasonable* interpretation." *Blackie v. State of Maine*, 75 F.3d 716, 721 (1st Cir. 1996) (emphasis in original). "[I]n business dealings, it does not in the end promote justice to seek strained interpretations in aid of those who do not protect themselves." *Triple-A*, 832 F.2d at 221 (citation and internal quotation marks omitted). The contract provided that post-dredge surveys were to be conducted using equipment and techniques "comparable" to those used in pre-dredge surveys, which in turn were represented to have been conducted "in accordance" with the 1994 Manual as it bore on Class 1 surveys. Post-dredge surveys hence had to be accomplished using equipment and techniques "comparable" to those described in the 1994 Manual. One purpose of the 1994 Manual was to enhance the equitability of contract administration, and it plainly directed that a half-foot tolerance be built into depth measurement in Class 1 surveys. As Cashman suggests, Pipeline's interpretation of the contract as contemplating that the 1994 Manual set a "floor" that OSI was free to exceed by whatever quantum was technologically feasible is unreasonable. This contract contemplated the dredging of a tidal-harbor floor and obliged Cashman to redredge at its expense whenever Pipeline's surveys showed it had not met performance specifications. *See* SOW at 1, 19, §§ 0102, 1026-27. In that context, zero tolerance in measurement was not "comparable" to a half-

---

but that is a separate matter.

foot tolerance, *i.e.*, "[l]ike or equivalent[.]"  *Webster's II New Riverside University Dictionary* 289 (1994).

Inasmuch as Cashman offers the only reasonable interpretation of the contract as it bears on the issue of measurement tolerances, I discern no ambiguity.  Accordingly, I grant Cashman's motion as it bears on the contract's incorporation of the standards (including measurement-tolerance standards) of the 1994 Manual.

## 2.  MLLW and Benchmark

Cashman next seeks to preclude Pipeline from adducing extrinsic evidence tending to prove that the parties fixed a bronze disk on Pipeline's Pier No. 2 as the benchmark for measurement of Cashman's performance of the contract.  *See Limine* Motion/Contract Terms at 3-6.  Cashman argues that the contract unambiguously fixed MLLW – described in the 1994 Manual as a "[t]idal datum defined by the mean of the lower low water heights, observed over a specific 19-year period" – as the contract's hydrographic survey standard.  *See id.* at 4-6; 1994 Manual, Exh. B thereto, at B-5.

Pipeline does not dispute that the contract set MLLW as the measurement unit or that the 1994 Manual correctly defines MLLW; however, it argues that this begs the critical question of the benchmark, or reference point, from which MLLW was to be measured.  *See Limine* Opposition/Contract Terms at 6 & n.3.  Pipeline asserts that the contract documents, together with instructions given during a pre-bid meeting, made clear that Cashman was to take its measurements from the bronze disk (regardless of whether that disk produced an accurate measurement of MLLW).  *See id.* at 6-7.[5]  Cashman protests, *inter alia*, that Pipeline improperly resorts to extrinsic evidence

_____

[5] The parties discovered near the end of the instant dredging project in March 2006 that the bronze disk, which was keyed to an earlier tidal epoch, did not accurately measure MLLW.  *See Limine* Motion/Contract Terms at 5 & n.2; *Limine* Opposition/Contract Terms at 7 & n.5.  MLLW was actually 0.26 foot higher (per Cashman) or 0.23 higher (per Pipeline) (*continued on next page*)

(notes of the pre-bid meeting) to bolster its case for the bronze disk.  *See Limine* Reply/Contract Terms at 1 n.1.  I agree.

Pipeline points to no language within the four corners of the contract establishing the bronze disk as the reference point from which measurements were to be taken.  *See Limine* Opposition/Contract Terms at 6-8.  Rather, it relies on a note to pre-dredge acoustic basement surveys performed by OSI that stated: "DEPTHS ARE IN FEET AND ARE REFERENCED TO MEAN LOWER LOW WATER (MLLW) BASED ON A BRONZE DISK STAMPED "20.14" LOCATED ON PIER NO. 2 WHICH HAS AN ELEVATION OF 20.14 FEET MEAN LOW WATER . . . AS PROVIDED BY PORTLAND PIPELINE CORPORATION."  *See* Notes for OSI Pipeline Seamless MLLW Contour Set ("OSI Survey Notes"), attached thereto as Exhibit C.  OSI's acoustic basement surveys, in turn, were included along with 12 drawings "generated to define the scope of work" and were "considered part of the Contract Documents[.]"  SOW at 2, § 0103.[6]

I am mindful that, as Pipeline's counsel has underscored, this was a complex, highly technical project, not easily grasped by a layperson.  Nonetheless, Pipeline does not argue that (i) the pre-bid meeting notes were incorporated by reference in the contract[7] or that (ii) the contract contained a latent ambiguity that might justify resort to extrinsic evidence for purposes of ascertaining whether any ambiguity existed.  *See generally Limine* Opposition/Contract Terms; *see*

---

than indicated by the disk – in other words, approximately three inches in Cashman's favor.  *See Limine* Opposition/Contract Terms at 7 & n.5; Post Road Surveying, Inc. report dated March 20, 2006, attached thereto; Titcomb Associates report dated June 26, 2006, attached to *Limine* Opposition/Contract Terms.

[6] At oral argument Cashman's counsel represented, and Pipeline's counsel did not dispute, that none of the 12 drawings apart from the OSI acoustic basement survey drawings contained a notation referencing the bronze disk.

[7] For purposes of advocating that the court take into consideration the pre-bid meeting notes, Pipeline's counsel has not relied on a section of the SOW contemplating that the parties would negotiate certain details of the project at a so-called "kickoff meeting."  *See Limine* Opposition/Contract Terms at 6-8; SOW at 3-4, § 0210.  The kickoff meeting was to take place after the bid's award, *see* SOW at 3-4, § 0210, whereas the pre-bid meeting presumably occurred prior to that point in time.  The contract provided, in relevant part: "The Contract Documents represent the entire and integrated agreement between the parties hereto and supersede all prior negotiations, representations or agreements, either written or oral."  Lump Sum Agreement, Exh. A to *Limine* Reply/Contract Terms, at 1 § 1.

10

*also, e.g., Villas by the Sea Owners Ass'n v. Garrity*, 2000 ME 48, ¶ 10, 748 A.2d 457, 461 ("[T]he court may look to extrinsic evidence to reveal a latent ambiguity.").

Confining my review to the four corners of the contract documents presented by the parties, I once again conclude that Cashman offers a reasonable interpretation, but Pipeline does not. As Cashman argues, the contract reasonably can be read to have fixed MLLW as the standard of measurement without specifying a point from which MLLW was to be measured. *See Limine* Motion/Contract Terms at 5-6. As Cashman's counsel suggested at oral argument, this is the equivalent of fixing a time for a meeting – say, 12:30 p.m. EST – and relying on the parties to have accurate watches, rather than specifying that the meeting time is to be ascertained with reference to a certain timepiece (regardless of that timepiece's accuracy). The contract, on its face, betrays no reason to believe that a single benchmark necessarily must be selected for a dredging project. In any event, there is no dispute that MLLW, like EST, has a precise definition. Finally, one reasonably can construe the notation to the acoustic basement survey drawings as revealing merely that, for purposes of the pre-dredge acoustic basement surveys, OSI chose, or was directed by Pipeline, to use the bronze disk as a reference point.

On the other hand, it is simply too great a stretch to deduce, from a notation to one set of surveys included with 12 additional contract drawings, that the parties intended the bronze disk to be used as the reference point for MLLW measurement throughout the project. Tellingly, Pipeline itself argues that this intention can be divined from a *combination* of the contract documents and the pre-bid meeting notes, not from the four corners of the contract alone. *See Limine* Opposition/Contract Terms at 6-7. Yet Pipeline offers no basis (beyond ambiguity of the contract) for taking the pre-bid meeting notes into account. *See id*. at 6; *see also Portland Valve*, 460 A.2d at

1387 ("Once an ambiguity is found then extrinsic evidence may be admitted and considered to show the intention of the parties.").

In sum, the contract unambiguously (i) fixed MLLW as the standard of measurement, (ii) provided a definition of MLLW via the 1994 Manual, incorporated by reference in the contract, and (iii) neither fixed, nor indicated any need to fix, a particular reference point from which MLLW was to be measured. No extrinsic evidence is admissible to vary the terms of an unambiguous contract. Accordingly, Cashman's motion is granted insofar as it seeks to preclude any bid by Pipeline to introduce extrinsic evidence for the purpose of showing that the parties intended to fix the bronze disk as their benchmark for measurement.

### B. *Limine* Motion/Surveying

In its *Limine* Motion/Surveying, Cashman requests an order barring Pipeline from introducing evidence and argument concerning Cashman's own hydrographic surveying on the bases that such evidence (i) is probative of nothing and (ii) would sow confusion, waste time, and unfairly prejudice Cashman. *See Limine* Motion/Surveying at 1. This is so, Cashman asserts, because:

1.      The parties' contract provided that Pipeline's surveys (done by OSI), not Cashman's, determined whether Cashman had completed its work. *See id*. at 1-2. Accordingly, in Cashman's view, the quality of its own surveying is irrelevant. *See id*. at 2.

2.      Even if Cashman's surveying is relevant, Pipeline's evidence would distract the jury from the real issue, whether Cashman completed its dredging work per OSI's surveying, not whether Cashman is itself an accomplished surveyor. *See id*. at 3-5.

Pipeline counters that:

1.      While it is true that OSI was to judge whether Cashman's performance was complete, evidence of Cashman's own poor surveying is relevant for at least two reasons: (i) to show that

Cashman's own poor planning and execution of the job, rather than any breach by Pipeline, caused its extra costs, and (ii) to challenge Cashman's "total cost" claim for damages, which incorporates its surveying costs.  *See* Defendant's Opposition to Plaintiff's Motion in *Limine* To Exclude Evidence Including Expert Opinion Testimony Concerning Jay Cashman, Inc.'s Hydrographic Surveying ("*Limine* Opposition/Surveying") (Docket No. 44) at 5-6.  Pipeline offers two of "numerous" examples of the negative effects that Cashman's surveying allegedly had on its performance: (i) its surveys were off by one foot through much of the 2005 dredging season (making it more likely that it did not finish the project in 2005), and (ii) its surveyor made a 0.68 foot conversion error in 2006, making it more likely that a large part of its 2006 surveying costs were attributable to its own error. *See id.* at 6.

2.      Cashman's surveying, rather than constituting a confusing and prejudicial sideline, played an integral role in its performance of the instant dredging job.  *See id.* at 6-7.

Cashman admits the two specific surveying errors cited by Pipeline but labels them red herrings because (i) Cashman is only claiming damages from late March 2005, when OSI's surveys show its work was complete, and (ii) Cashman's work in 2006 consisted of addressing locations that Pipeline directed it to address.  *See* Plaintiff Jay Cashman, Inc.'s Reply to Defendant's Opposition to Plaintiff's Motion in *Limine* To Exclude Evidence Including Expert Opinion Testimony Concerning Cashman's Hydrographic Surveying ("*Limine* Reply/Surveying") (Docket No. 53) at 2.  It argues that the contract's extra-work provision does not entitle Pipeline to a rebate for poor performance on Cashman's part and that, in any event, as its counsel underscored at oral argument, it is willing to forgo damages for costs of its surveyor if need be.  *See id.* at 4.

Pipeline has the better argument.  "Relevant evidence" is defined as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action

more probable or less probable than it would be without the evidence." Fed. R. Evid. 401. Cashman's willingness to excise surveying costs from its damages claim does not wholly blunt Pipeline's argument that its evidence of Cashman's surveying is relevant. As Pipeline correctly notes: "If the jury believes that Cashman did poor survey work in 2005, that tends to disprove that it was the Pipeline's fault that Cashman returned in 2006. . . . If the jury believes that Cashman eventually came to rely on OSI for practically all survey work, not just the clearing survey, that tends to prove that OSI's costs sought in the Pipeline's setoff are justifiable." *Limine* Opposition/Surveying at 6.[8] While Cashman contests the relevance of the two examples provided by Pipeline, *see Limine* Reply/Surveying at 2, they are offered only as examples. It is far from clear that all evidence of Cashman's flawed surveying is irrelevant in all possible settings.

Nor does Cashman make a convincing case that the evidence it seeks to exclude is more confusing or unfairly prejudicial than probative. Cashman's surveys were integral to the process of its job performance. It is difficult to see how the jury could grasp this case without being informed of the role those surveys played. The parties' able counsel do not dispute, and are capable of making clear to the jury, that under the contract, the judgment as to whether Cashman completed performance was to be made solely on the basis of OSI's post-dredging surveys.

For these reasons, Cashman's motion to bar Pipeline from adducing evidence addressing Cashman's hydrographic surveys is denied on the showing made.

---

[8] Pipeline seeks a setoff of $327,676 from the contract price for costs of certain OSI survey services in 2005 and 2006 and certain dive services in 2005. *See* Answer (Docket No. 3) at 7.

## II.  Motion for Partial Summary Judgment

### A.  Summary Judgment Standards

#### 1.  Federal Rule of Civil Procedure 56

Summary judgment is appropriate only if the record shows "that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c); *Santoni v. Potter*, 369 F.3d 594, 598 (1st Cir. 2004).  "In this regard, 'material' means that a contested fact has the potential to change the outcome of the suit under the governing law if the dispute over it is resolved favorably to the nonmovant.  By like token, 'genuine' means that 'the evidence about the fact is such that a reasonable jury could resolve the point in favor of the nonmoving party.'"  *Navarro v. Pfizer Corp.*, 261 F.3d 90, 93-94 (1st Cir. 2001) (quoting *McCarthy v. Northwest Airlines, Inc.*, 56 F.3d 313, 315 (1st Cir. 1995)).

The party moving for summary judgment must demonstrate an absence of evidence to support the nonmoving party's case.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).  In determining whether this burden is met, the court must view the record in the light most favorable to the nonmoving party and give that party the benefit of all reasonable inferences in its favor.  *Santoni*, 369 F.3d at 598.  Once the moving party has made a preliminary showing that no genuine issue of material fact exists, the nonmovant must "produce specific facts, in suitable evidentiary form, to establish the presence of a trialworthy issue."  *Triangle Trading Co. v. Robroy Indus., Inc.*, 200 F.3d 1, 2 (1st Cir. 1999) (citation and internal punctuation omitted); Fed. R. Civ. P. 56(e).  "As to any essential factual element of its claim on which the nonmovant would bear the burden of proof at trial, its failure to come forward with sufficient evidence to generate a trialworthy issue warrants summary judgment to the moving party."  *In re Spigel*, 260 F.3d 27, 31 (1st Cir. 2001) (citation and internal punctuation omitted).

## 2. Local Rule 56

The evidence the court may consider in deciding whether genuine issues of material fact exist for purposes of summary judgment is circumscribed by the Local Rules of this District. *See* Loc. R. 56. The moving party must first file a statement of material facts that it claims are not in dispute. *See* Loc. R. 56(b). Each fact must be set forth in a numbered paragraph and supported by a specific record citation. *See id.* The nonmoving party must then submit a responsive "separate, short, and concise" statement of material facts in which it must "admit, deny or qualify the facts by reference to each numbered paragraph of the moving party's statement of material facts[.]" Loc. R. 56(c). The nonmovant likewise must support each denial or qualification with an appropriate record citation. *See id.* The nonmoving party may also submit its own additional statement of material facts that it contends are not in dispute, each supported by a specific record citation. *See id.* The movant then must respond to the nonmoving party's statement of additional facts, if any, by way of a reply statement of material facts in which it must "admit, deny or qualify such additional facts by reference to the numbered paragraphs" of the nonmovant's statement. *See* Loc. R. 56(d). Again, each denial or qualification must be supported by an appropriate record citation. *See id.*

Failure to comply with Local Rule 56 can result in serious consequences. "Facts contained in a supporting or opposing statement of material facts, if supported by record citations as required by this rule, shall be deemed admitted unless properly controverted." Loc. R. 56(e). In addition, "[t]he court may disregard any statement of fact not supported by a specific citation to record material properly considered on summary judgment" and has "no independent duty to search or consider any part of the record not specifically referenced in the parties' separate statement of fact." *Id.*; *see also, e.g., Cosme-Rosado v. Serrano-Rodriguez*, 360 F.3d 42, 45 (1st Cir. 2004) ("We have consistently upheld the enforcement of [Puerto Rico's similar local] rule, noting repeatedly that

parties ignore it at their peril and that failure to present a statement of disputed facts, embroidered with specific citations to the record, justifies the court's deeming the facts presented in the movant's statement of undisputed facts admitted.") (citations and internal punctuation omitted).

## B. Factual Context

The parties' statements of material facts, credited to the extent either admitted or supported by record citations in accordance with Local Rule 56, reveal the following facts relevant to resolution of Pipeline's summary-judgment motion:[9]

This litigation arises out of a contract between Pipeline and Cashman pursuant to which Cashman was retained to perform dredging work in the Portland Harbor Approach Channel. Defendant's Statement of Material Facts in Support of Its Motion for Partial Summary Judgment ("Defendant's SMF"), attached to Defendant's S/J Motion, ¶ 1; Plaintiff Jay Cashman, Inc.'s Response to Defendant Portland Pipeline, Inc.'s Statement of Material Facts and Plaintiff's Statement of Additional Material Facts ("Plaintiff's Opposing SMF"), attached to Plaintiff Jay Cashman, Inc.'s Memorandum of Law in Opposition to Defendant's Motion for Partial Summary Judgment ("Plaintiff's S/J Opposition") (Docket No. 45), ¶ 1.[10] Pipeline determined that it needed to deepen a portion of the Portland Harbor Channel to allow vessels with a deeper draft to access the Pipeline pier terminals. Statement of Additional Material Facts ("Plaintiff's Additional SMF"), commencing on page 8 of Plaintiff's Opposing SMF, ¶ 62; Defendant's Reply Statement of Material Facts in Response to Plaintiff's Statement of Additional Material Facts ("Defendant's Reply SMF")

---

[9] As noted above, Local Rule 56 requires a party responding to a statement of material facts to admit, deny or qualify the underlying statement. *See* Loc. R. 56(c)-(d). The concept of "qualification" presupposes that the underlying statement is accurate but in some manner incomplete, perhaps even misleading, in the absence of additional information. Except to the extent that a party, in qualifying a statement, has expressly controverted all or a portion of the underlying statement, I have deemed it admitted.

[10] Cashman qualifies this statement, asserting that (i) this litigation arises out of disputes related to dredging work Cashman performed as part of the Portland Harbor Approach Channel Deeping Project ("Project"), and (ii) Cashman was (*continued on next page*)

(Docket No. 47) ¶ 62.  The deeper the draft of the vessel, the more oil it would carry and the better the economics of the shipment.  *Id.*[11]

The details of the work to be completed under the contract were contained in a series of documents incorporated by reference, including 12 technical drawings specific to the Project, a series of acoustic basement drawings, seven technical reports, dive videos, and governmental permits from local, state, and federal governments.  Defendant's SMF ¶ 2; Plaintiff's Opposing SMF ¶ 2.[12]  Under the state permit, dredging in the approach channel was permissible only between January 1, 2005 and March 31, 2005 – a 90-day job – for environmental reasons primarily related to lobster habitat.  *Id.* ¶ 3.[13]  In general terms, the contract required Cashman to dredge down to an elevation of minus 48 feet MLLW generally and to minus 49 feet MLLW in the till and bedrock areas.  *Id.* ¶ 4.  The lump-sum contract price for this work was $1,950,000.  *Id.* ¶ 7.[14]  Pipeline drafted the contract for the Project.  Plaintiff's Additional SMF ¶ 45; Defendant's Reply SMF ¶ 45.  Cashman did not draft the terms of the contract.  *Id.* ¶ 46.

---

the successful bidder on the Project and entered into a contract with Pipeline to do the work.  Plaintiff's Opposing SMF ¶ 1; Affidavit of W. Bruce Wood ("Wood Aff."), Exh. A thereto, ¶¶ 1-2.

[11] Pipeline qualifies this statement, asserting that it decided to go ahead with the Project so that the same vessels that had been accessing the Pipeline piers could come in more fully laden with oil.  Defendant's Reply SMF ¶ 62; 30(b)(6) Deposition of: Kenneth P. Brown . . . on September 17, 2007 ("Sept. 17 Brown Dep."), Exh. A to Affidavit of Nikolas P. Kerest ("Kerest Aff.") (Docket No. 48), at 7-8; Deposition of: Stanwood L. Given, III ('Given Dep."), Exh. C to Kerest Aff., at 23.

[12] Cashman qualifies this statement, asserting that the details of the contractual work were contained in the text of the contract.  Plaintiff's Opposing SMF ¶ 2; Exhs. B-E thereto.

[13] Cashman qualifies this statement, asserting that, although the original Maine Department of Environmental Protection ("DEP") permit for the Project covered the period from January 1, 2005 through March 31, 2005, Pipeline was granted an extension until April 15, 2005.  Plaintiff's Opposing SMF ¶ 3; Sept. 17 Brown Dep. at 158.  Cashman adds that Pipeline did not notify it of the extension, as a result of which it was unable to schedule dredging operations in the most effective manner.  Plaintiff's Opposing SMF ¶ 3; Deposition of James Galli, P.E. ("Galli Dep."), Exh. G thereto, at 56-57.

[14] Cashman qualifies this statement, asserting that the contract contemplated payment of $1,950,000 to create a channel of minus 49 feet MLLW in the till and bedrock areas and minus 48 feet MLLW in the remaining non-rock areas, but as the Project went forward, Cashman discovered information that materially affected its ability to complete the Project. Plaintiff's Opposing SMF ¶ 7; Lump Sum Agreement, Exh. B thereto, at 2, ¶ 4(a); Wood Aff. ¶ 4.  Cashman asserts that, if Pipeline had disclosed this information, it either would not have submitted a bid for the Project or would have submitted a substantially higher bid.  Plaintiff's Opposing SMF ¶ 7; Wood Aff. ¶ 4.

Through this litigation, Cashman has asserted a claim that ranges from $2,760,330 to $2,982,330 for alleged extra work, more than the total amount of the contract Cashman signed. Defendant's SMF ¶ 16; Plaintiff's Opposing SMF ¶ 16.  Cashman's job under the contract included removing harbor bottom down to the contract-defined performance limits.  *Id.* ¶ 17.  Cashman's job under the contract included notifying Pipeline when Cashman believed it had achieved the performance limits and was ready to have Pipeline verify performance through third-party post-dredge hydrographic survey.  *Id.* ¶ 18.  Cashman's job under the contract included redredging any areas identified by the post-dredge survey that did not meet the performance limits per the contract. *Id.* ¶ 19.[15]

The day before Cashman was to start dredging in 2005, a ship collided with its dredge that was moored outside the channel.  Plaintiff's Additional SMF ¶ 31; Defendant's Reply SMF ¶ 31.  As a result of the collision, Cashman's primary production vessel was damaged and taken out of service.  *Id.*  The collision occurred through no fault of Cashman and was not a foreseeable event. *Id.*

Cashman did not finish its work as scheduled in 2005.  Defendant's SMF ¶ 8; Plaintiff's Opposing SMF ¶ 8.[16]  At the end of the 2005 dredging season, Pipeline had the choice of terminating the contract with Cashman for cause and hiring a new contractor to complete the dredging or working out a way to have Cashman return and finish the Project in 2006.  Defendant's SMF ¶ 9; Declaration of Stanwood L. Given III ("Given Decl."), attached thereto, ¶ 13.[17]  Cashman

---

[15] Cashman qualifies this statement, asserting that it was required to conduct work outside the scope of the contract because of errors made by Pipeline and its surveyor.  Plaintiff's Opposing SMF ¶ 19; Wood Aff. ¶¶ 12-14.

[16] Cashman qualifies this statement and several others made by Pipeline, asserting that at the end of the 2005 dredging season, it had substantially completed the Project, and Pipeline was made aware of its position.  Plaintiff's Opposing SMF ¶¶ 8-10, 13, 15; Wood Aff. ¶ 19.

[17] Cashman denies this statement on the basis of its objection that the Given Declaration falls into the category of "[s]elf-serving affidavits that do not contain adequate specific factual information based on personal knowledge[, which] are (*continued on next page*)

19

agreed and committed in a meeting on April 28, 2005 with Bruce Wood and Jay Cashman for Cashman and Marjorie Dawson, Dave Cyr, Ken Brown, and Stan Given for Pipeline to return to complete the contract dredge work in 2006.  Defendant's SMF ¶ 10; Plaintiff's Opposing SMF ¶ 10.[18]   At that time, Cashman posted a substantial letter of credit to guaranty its return and performance.  *Id.* ¶ 11.  Cashman signed a "Contract Work Order" agreeing to extend the work period of the original contract through July 31, 2006.  *Id.* ¶ 12.  Pipeline accepted the letter of credit and Cashman's commitment to return to finish the job.  *Id.* ¶ 13.  Pipeline obtained the necessary permit revisions and notifications required to extend the dredge period for 2006.  *Id.* ¶ 14.  Cashman returned to Portland in 2006 to work another full dredging season, from early January through late March 2006, to complete its contract.  *Id.* ¶ 15.[19]

At the end of the 2005 dredging season, Cashman believed that it had substantially completed the Project, and Pipeline was made aware of that position.  Plaintiff's Additional SMF ¶ 43; Wood Aff. ¶ 19.[20]   By the end of the 2005 dredging season, Cashman believed that there was a minimal amount of material in the channel that was above the performance limits, and Pipeline was made aware of that position.  Plaintiff's Additional SMF ¶ 44; Wood Aff. ¶ 20.[21]   At the end of the

---

[18] Cashman qualifies this statement and others made by Pipeline, asserting that the only way it could receive the money it was owed under the contract was to post a letter of credit and return to Portland in 2006 to do more dredging.  Plaintiff's Opposing SMF ¶¶ 10-11, 13; Wood Aff. ¶ 22.

[19] Cashman qualifies this statement, asserting that when it returned to Portland Harbor Channel in 2006 it was fulfilling Pipeline's continual demands to dredge, there was little if any material left to dredge, and it did not expect it would be working for an entire dredging season.  Plaintiff's Opposing SMF ¶ 15; Deposition of Dale H. Pyatt ("Pyatt Dep."), Exh. I thereto, at 53-55; Deposition of Alex Dick ("Dick Dep."), Exh. K to Plaintiff's Opposing SMF, at 81-82.

[20] Pipeline denies this statement, *see* Defendant's Reply SMF ¶ 43; however, I view the facts in the light most favorable to Cashman, as non-movant.

[21] Pipeline qualifies this statement, asserting that both parties agreed that there was less than 1,000 cubic yards of material above the contract specifications after the 2005 dredging season.  Defendant's Reply SMF ¶ 44; Sept. 17 Brown Dep. at 156-57.

2005 dredging season, Cashman requested payment from Pipeline because the work had been substantially completed.  Plaintiff's Additional SMF ¶ 55; Wood Aff. ¶ 19.[22]

As the Project went forward, Cashman learned that Pipeline had a significantly different understanding of what the contract required and how its terms should be interpreted.  Plaintiff's Additional SMF ¶ 32; Wood Aff. ¶ 5.  For example, Pipeline did not disclose its intention to judge Cashman's work against an inflexible and unrealistically precise standard until after the Project was under way.  *Id.*[23]  When Cashman submitted its bid, it understood that the standards set out in the 1994 Manual would be used for post-dredge surveys.  Plaintiff's Additional SMF ¶ 33; Wood Aff. ¶ 5.  This manual recognizes the margin of error inherent in surveying equipment and techniques as being in the range of one-half foot.  *Id.*  Pipeline, however, judged Cashman's work to the .01 and .1 of a foot level.  *Id.*[24]

An undisclosed error in the benchmark resulted in Pipeline's surveyor requiring Cashman to dredge the channel to 48.26 feet MLLW instead of the performance standard stated in the contract of 48 feet MLLW.  Plaintiff's Additional SMF ¶ 37; Wood Aff. ¶ 9.[25]  During the bid process for the Project, Pipeline did not discuss with prospective contractors that the bronze disk was not at 20.14 MLW when using the NOAA datum.  Plaintiff's Additional SMF ¶ 47; Defendant's Reply SMF 47.[26]  In the spring of 2006, after Cashman had completed its contract, Pipeline hired a surveyor,

---

[22] Pipeline denies this statement, *see* Defendant's Reply SMF ¶ 55; however, I view the facts in the light most favorable to Cashman as non-movant.

[23] Pipeline denies paragraph 32, *see* Defendant's Reply SMF ¶ 32; however, I view the facts in the light most favorable to Cashman as non-movant.

[24] Pipeline denies paragraph 33, *see* Defendant's Reply SMF ¶ 33; however, I view the facts in the light most favorable to Cashman, as non-movant.

[25] Pipeline denies this, *see* Defendant's Reply SMF ¶ 37; however, I view the facts in the light most favorable to Cashman, as non-movant.

[26] Pipeline qualifies this statement, asserting that until the middle of March 2006, about two weeks before the end of the contract period, neither party was aware that the elevation stamped on the bronze disk on Pipeline's Pier No. 2 had not been adjusted to the latest NOAA tidal-epoch data.  Defendant's Reply SMF ¶ 47; Sept. 17 Brown Dep. at 37-39.  Pipeline adds that Cashman's land surveyor, Post Road Surveying, made this discovery as part of its attempt to determine (*continued on next page*)

Titcomb Associates, to establish the elevation of the bronze disk.  *Id.* ¶ 48.  The results of that survey showed that the bronze disk was not at 20.14 MLW.  *Id.*[27]  Pipeline did not notify Cashman when the Titcomb Associates survey found the benchmark was inaccurate.  *Id.* ¶ 49.[28]

Pipeline required Cashman to dredge to remove areas that had been reported to be in excess of a performance elevation by .01 foot and .1 foot.  *Id.* ¶ 29.  These directions were based on surveys performed by OSI.  *Id.*[29]  OSI's surveyors have acknowledged that there is a margin of error of .2 foot in their surveying techniques and methodology 95 percent of the time.  *Id.* ¶ 30.[30]  Cashman was forced to go back and redredge areas that would have been determined to be clear if an accurate benchmark had been used.  Plaintiff's Additional SMF ¶ 34; Wood Aff. ¶ 5; Deposition of Jay Cashman, Inc., by William Bruce Wood, Exh. H to Plaintiff's Opposing SMF ("Wood

---

why Cashman's surveys were inaccurate.  Defendant's Reply SMF ¶ 47; Deposition of Jay Cashman, Inc., by William Bruce Wood, Exh. H to Kerest Aff. ("Wood Dep./Defendant), at 144; Deposition of Daniel J. Gaudet ("Gaudet Dep."), Exh. I to Kerest Aff., at 135, 165.

[27] Pipeline qualifies paragraph 48, asserting that in spring 2006 Titcomb Associates completed a ground survey for Pipeline in advance of OSI's hydrographic survey that would form the basis for the charting of the channel.  Defendant's Reply SMF ¶ 48; Sept. 17 Brown Dep. at 38-39, 41.  Pipeline adds that, as part of that ground survey, Titcomb Associates found that the bronze disk was not 20.14 MLW using the latest NOAA tidal-epoch data.  Defendant's Reply SMF ¶ 48; Sept. 17 Brown Dep. at 37-39.

[28] Pipeline qualifies this statement, asserting that Titcomb Associates found that the bronze disk was .23 foot higher than 20.14 MLW, using the latest NOAA tidal-epoch data, in June 2006, more than one month after the contract's conclusion.  Defendant's Reply SMF ¶ 49; Sept. 17 Brown Dep. at 38-39; Titcomb Associates report dated June 26, 2006, attached to *Limine* Opposition/Contract Terms.

[29] Pipeline qualifies paragraph 29, asserting, *inter alia*, that upon Project completion it wanted to be sure that the relevant charting agencies would chart a 48-foot channel.  Defendant's Reply SMF ¶ 29; Sept. 17, 2007 Brown Dep. at 42-43; Given Dep. at 53-54.  Therefore, it says, when OSI's surveys showed Cashman's performance in excess of performance elevation by .1 or even .01 feet, in most circumstances it required Cashman to redredge those areas.  Defendant's Reply SMF ¶ 29; Given Dep. at 53-54.

[30] I omit Cashman's further statement that OSI's surveyors acknowledged a margin of error of up to a foot five percent of the time.  Plaintiff's Additional SMF ¶ 30.  As Pipeline points out, neither Russell Watson nor George Reynolds, on whose testimony Cashman relies for this point, testified that the margin of error was up to a foot five percent of the time.  Defendant's Reply SMF ¶ 30; Watson Dep., Exh. L to Plaintiff's Opposing SMF, at 20; Reynolds Dep., Exh. M to Plaintiff's Opposing SMF, at 62.  As both parties note, *see* Plaintiff's Additional SMF ¶ 30; Defendant's Reply SMF ¶ 30, Reynolds did testify that OSI met "the corps spec for accuracy for this type of environment" and that the "corps spec" was "[a] half a foot to a foot[,]" Reynolds Dep. at 111, but he corrected his testimony in an errata sheet to one-half foot, Errata Sheet for the Deposition of George Reynolds, attached thereto.

Dep./Plaintiff"), at 65-66, 109-10. *Id.* Cashman was spending time, money and effort on areas that actually were "clear" according to the performance limits stated in the contract. *Id.*[31]

The benchmark problems were compounded by Pipeline's decision to employ an inflexible and unreasonable standard in judging the status of Cashman's work. Plaintiff's Additional SMF ¶ 35; Wood Aff. ¶ 5.[32] Pipeline also re-surveyed large areas of the channel even though these areas previously had been "cleared" pursuant to the terms of the contract. Plaintiff's Additional SMF ¶ 38; Wood Aff. ¶ 5.[33] Cashman encountered rock that it had not anticipated when it submitted its bid. Plaintiff's Additional SMF ¶ 39; Defendant's Reply SMF ¶ 39. Cashman notified Pipeline of this development. *Id.*[34]

As the Project went forward, Cashman discovered information that materially affected its ability to complete the Project. Plaintiff's Additional SMF ¶ 63; Wood Aff. ¶ 4. If Pipeline had disclosed this information to Cashman, Cashman either would not have submitted a bid for the Project or would have submitted a bid substantially higher than the bid it actually submitted. *Id.*[35]

Cashman was bidding on two potential projects. Plaintiff's Additional SMF ¶ 50; Defendant's Reply SMF ¶ 50. The first was to create a channel that was minus 49 feet MLLW in the till and bedrock areas and minus 48 feet MLLW in the remaining non-rock areas. *Id.* The second

---

[31] Pipeline denies paragraph 34, *see* Defendant's Reply SMF ¶ 34; however, I view the facts in the light most favorable to Cashman, as non-movant.

[32] Pipeline denies this, *see* Defendant's Reply SMF ¶ 35; however, I view the facts in the light most favorable to Cashman, as non-movant.

[33] Pipeline denies this, *see* Defendant's Reply SMF ¶ 38; however, I view the facts in the light most favorable to Cashman, as non-movant.

[34] Pipeline qualifies paragraph 39, asserting that it does not know what rock Cashman anticipated finding when it submitted its bid, but the contract states that "[t]he Contractor shall be responsible to evaluate the volume and composition of targeted materials and their dredging and excavation characteristics based on the information incorporated and referenced within these specifications and other information available to or acquired by the Contractor. In addition, the Contractor may conduct additional on-site investigations at his expense." Defendant's Reply SMF ¶ 39; SOW, Exh. D to Plaintiff's Opposing SMF, at 8, § 0270. In addition, Pipeline asserts that Cashman notified it of alleged "unanticipated" rock in Area C on March 1, 2006, which was untimely notice under the contract. Defendant's Reply SMF ¶ 39; General Conditions, Exh. C to Plaintiff's Opposing SMF, at 5-6, ¶ 8(a)-(b).

[35] Pipeline denies this statement, *see* Defendant's Reply SMF ¶ 63; however, I view the cognizable evidence in the light (*continued on next page*)

was to create a channel that was minus 51 feet MLLW in the till and bedrock areas and minus 50

feet MLLW in the remaining non-rock areas.  *Id*.  Cashman submitted a bid for both projects.  *Id*. ¶

51.  Its bid for the 48/49 foot MLLW channel was $1,950,000, and its bid for the 51/50 MLLW

channel was $6,964,000.  *Id*.  The contract documents estimated that creation of the 48/49 foot

MLLW channel would entail removal of 36,000 cubic yards of material, including 3,300 yards of

"hard" material.  *Id*. ¶ 52.[36]  Creation of the minus 50 foot MLLW channel was estimated to require

removal of 240,000 cubic yards of material, including 30,000 cubic yards of rock material.  *Id*. ¶54.

Cashman dredged in excess of 140,000 cubic yards of material from the Portland Harbor Channel.

*Id*. ¶ 53.[37]

Cashman made its complaints and claims known to Pipeline prior to litigation.  *Id*. ¶ 40.[38]

Cashman did notify Pipeline that Cashman had done work outside the scope of the contract.

Plaintiff's Additional SMF ¶ 41; Wood Aff. ¶ 14.[39]  Cashman notified Pipeline that it was

unreasonably requiring Cashman to address shoals from lobster pots, scalloping, and natural forces

that Cashman had never understood to be part of its contractual obligation.  Plaintiff's Additional

---

most favorable to Cashman as non-movant.

[36] Pipeline qualifies paragraphs 52 and 54, noting that the contract stated: "These estimates are provided for information purposes only.  The Contractor shall be responsible to evaluate the volume and composition of targeted materials and their dredging and excavation characteristics based on the information incorporated and referenced within these specifications and other information available to or acquired by the Contractor."  Defendant's Reply SMF ¶¶ 52, 54; SOW at 8, § 0270.  Pipeline adds that the volume estimates did not account for overdredge.  Defendant's Reply SMF ¶¶ 52, 54; Sept. 17 Brown Dep. at 76.

[37] Pipeline qualifies this statement, asserting that Cashman dredged in excess of 140,000 cubic yards (including overdredge) while working on the Project inside and outside of the contract area.  Defendant's Reply SMF ¶ 53; Sept. 17 Brown Dep. at 74.

[38] Pipeline qualifies this statement, asserting that under the terms of the contract, Cashman was required to provide notice of its claims for, among other things, extra work and/or extra compensation within fourteen days after the basis for the claim arose.  Defendant's Reply SMF ¶ 40; General Conditions at 5-6, ¶ 8(a)-(b).  Pipeline adds that Cashman was also required to provide a detailed and properly documented statement of the basis of its claim within 30 days of making the original claim.  Defendant's Reply SMF ¶ 40; General Conditions at 5-6, ¶¶ 8(a)-(c), 9.  According to Pipeline, although Cashman made complaints and claims known prior to litigation, it did not comply with contract notice provisions. Defendant's Reply SMF ¶ 40; Sept. 17 Brown Dep. at 27-28, 33.

[39] Pipeline denies this, *see* Defendant's Reply SMF ¶ 41; however, I view the facts in the light most favorable to Cashman as non-movant.

SMF ¶ 42; Defendant's Reply SMF ¶ 42.[40]  Cashman never suggested changing the terms of the contract during contract performance in 2005 and 2006.  Defendant's SMF ¶ 24; Given Decl. ¶ 28.[41] Cashman never repudiated the contract or even threatened to do so.  Defendant's SMF ¶ 25; Given Decl. ¶ 29.[42]

The contract between Cashman and Pipeline has a provision covering claims for extra work by Cashman.  Defendant's SMF ¶ 27; Plaintiff's Opposing SMF ¶ 27.[43]  Cashman stated in a letter to Pipeline dated June 23, 2004 that it would finish the Project in 2005 in 45 days rather than the allotted 90 days.  *Id*. ¶ 28.[44]

Moffatt & Nichols is a consulting engineering company that does work specializing in port and marine infrastructure.  Plaintiff's Additional SMF ¶ 57; Defendant's Reply SMF ¶ 57.  Moffatt & Nichols was originally hired by Pipeline to provide preliminary design for the deepening of the Portland Harbor Channel.  *Id*. ¶ 58.  In October 2003, Moffatt & Nichols declined further involvement in the Portland Harbor dredging project because of concerns over Pipeline's approach. *Id*. ¶ 59.  Specifically, Moffatt & Nichols warned Pipeline about the risk it was running by going forward with the Project in the absence of detailed design and associated construction documents. *Id*.  Pipeline was told:

---

[40] Pipeline qualifies this statement, stating, *inter alia*, that Cashman did not comply with the notice of provisions of the contract.  Defendant's Reply SMF ¶ 42; Given Decl. ¶¶ 28-30.

[41] Cashman purports to deny this statement; however, its denial is in the nature of a qualification, to wit, that it consistently notified Pipeline that Pipeline was administering the contract in an unreasonable manner and imposing on Cashman an obligation not required by the contract.  Plaintiff's Opposing SMF ¶ 24; Wood Aff. ¶ 18.

[42] Cashman purports to deny this statement, but its denial is the nature of a qualification, to wit, that it continually protested the arbitrary and unreasonable way in which Pipeline was administering and interpreting the contract. Plaintiff's Opposing SMF ¶ 25; Wood Aff. ¶ 18.

[43] Cashman qualifies this statement, asserting, *inter alia*, that it continually tried to satisfy Pipeline and resolve its concerns even though its attempts to satisfy Pipeline exceeded the requirements of the contract, but it never intended to abandon its claims if no amicable resolution was possible.  Plaintiff's Opposing SMF ¶ 27; Wood Aff. ¶ 23.

[44] Cashman qualifies this statement, asserting that extenuating circumstances impacted its work progress; for example, in January 2005, the same month it began drilling work, a Cashman vessel was involved in an "allision," taking a major piece of equipment out of service.  Plaintiff's Opposing SMF ¶ 28; Wood Dep./Plaintiff at 62-63.  Allisions are "collisions between a vessel and a stationary object[.]"  *Continental Grain Co. v. Puerto Rico Mar. Shipping Auth*., 972 (*continued on next page*)

Inasmuch as review and commentary on the subject bid package could be construed as an endorsement of the approach [Pipeline] is taking, we respectfully decline further involvement. We wish, on the other hand, to mention that we have concerns about the [Pipeline] approach. For example[,] in the absence of a detailed design and associated construction documents that clearly define the work for the contractor, [Pipeline] is effectively enabling the contractor to perform the work on a time and material basis. This may not work to [Pipeline's] advantage. The concern is that the contractor will argue change conditions if the quantities or dredged material properties differ from those represented in the bid package (detailed plans and specifications would dramatically reduce this possibility). Further you **should** consider liquidated damages to make sure the contractor completes the work within a specified time. This is critical both from the point of view of cost control as well as meeting the schedule dictated by the environmental dredging window. There are many other particulars provided in typical dredging specifications that serve to protect the owners; too many to cite here. Finally, you should keep in mind that the preliminary opinions of probable costs we have forwarded in the past assumed a conventional design approach where the nature of the work could be controlled with the construction documents. Using [Pipeline's] proposed, i.e., less defined approach could result in significant increases in construction costs, particularly if there are disputes with the contractor over weather, soil/rock conditions, quantity measurements, etc.

*Id*. ¶ 59 (emphasis in original). Pipeline did not produce Exhibit R [the foregoing letter] in discovery. *Id*. ¶ 60. It was obtained by Cashman in response to a subpoena issued to Moffat & Nichols. *Id*.[45]

---

F.2d 426, 436 (1st Cir. 1992).

[45] I omit paragraph 61, which is neither admitted nor supported by the citation provided.

## C.  Analysis

Pipeline moves for summary judgment on three of the five counts of Cashman's complaint, Count II (*quantum meruit*), Count III (unjust enrichment), and Count V (unconscionability and breach of the duty of good faith and fair dealing).  *See* Defendant's S/J Motion at 1; Complaint.  The parties agree that Maine law governs resolution of their dispute.  *See* Defendant's S/J Motion at 4-7; Plaintiff's S/J Opposition at 6-16.  Pipeline seeks summary judgment as to both Counts II and III on the ground that, as a matter of law, Cashman cannot be entitled to extracontractual remedies with respect to matters that, in Pipeline's view, were governed entirely by the parties' contract.  *See* Defendant's S/J Motion at 5.  It seeks summary judgment as to Count V on the bases that (i) Cashman cannot demonstrate the requisites of unconscionability, which include a showing that, as of the time of execution of a contract, it contained terms so unfair as to "shock the conscience," and (ii) Maine has not recognized the existence of an implied duty of good faith and fair dealing outside the context of the Uniform Commercial Code ("UCC"), which governs transactions in goods, not construction services.  *See id*. at 6-7.

Cashman rejoins that the instant motion should be disallowed as untimely because (i) Pipeline knew or should have known about the grounds raised therein since the outset of this litigation, (ii) Pipeline represented, during a conference between the court and counsel on a joint motion seeking extension of filing deadlines, that it was unlikely to file any dispositive motions, and (iii) Pipeline could and should have styled this as a motion to dismiss rather than a more onerous motion for summary judgment.  *See* Plaintiff's S/J Opposition at 3-5.  In the alternative, Cashman argues that (i) under Maine law, the existence of a contract does not *per se* bar equitable claims such as those it brings in Counts II and III, (ii) it adduces sufficient evidence to survive Pipeline's motion for summary judgment with respect to those counts, (iii) it adduces sufficient evidence to make out a

claim of unconscionability, and (iv) Maine has in fact extended the implied duty of good faith and fair dealing beyond the confines of the UCC, recognizing, for example, that the concept is relevant to whether a contractor's performance has been substantially completed.  *See id*. at 6-16.[46]

For the reasons that follow, I conclude that (i) Cashman's claim of untimely filing is without merit, and (ii) Pipeline demonstrates entitlement to summary judgment as to Counts III and V, but not as to Count II.

## 1.  Cashman's Claim of Untimely Filing

On March 7, 2008, Pipeline filed the instant motion for partial summary judgment.  *See* Docket No. 27.  Pursuant to a January 17, 2008 order granting a motion by Cashman to extend time, that was the date on which dispositive motions were due.  *See* Docket Nos. 19-20.  The instant motion hence was timely filed.  It is of no consequence that Pipeline could have filed it sooner or could have styled it as a motion to dismiss.  It is also irrelevant that Pipeline represented during a conference between the court and counsel on November 6, 2007 that it likely would not file any dispositive motions.  *See* Docket No. 17.  Pipeline never declared that it would not file such a motion and never waived its right to do so.  *See id*.  Nor is there any indication that its representation was made in bad faith.  Cashman's timeliness challenge accordingly must fail.

---

[46] Cashman also argues that the contract may have been voided by a material mistake of fact, in which case Cashman's only remedies would be extracontractual ones.  *See* Plaintiff's S/J Opposition at 6 n.3.  Cashman posits that this possibility alone renders summary judgment inappropriate as to Counts II and III.  *See id*.  The material mistake to which Cashman refers is the belief that the bronze disk on Pipeline's Pier No. 2 accurately measured MLW.  *See id*.  As Cashman acknowledges, this mistake could void the contract only if a fact-finder were to determine that the contract fixed the bronze disk as the benchmark for the Project.  *See id*.  In ruling on Cashman's pending *Limine* Motion/Contract Terms, I found that the contract unambiguously did not fix the bronze disk as the Project's benchmark.  Cashman's material-mistake ground for opposing summary judgment as to Counts II and III is accordingly moot.

## 2.  Count II: *Quantum Meruit*

As the Law Court has explained, *quantum meruit* and unjust enrichment are distinct causes of action: "*Quantum meruit*, also sometimes labelled 'contract implied in fact,' involves recovery for services or materials provided under an implied contract.  Unjust enrichment describes recovery for the value of the benefit retained when there is no contractual relationship, but when, on the grounds of fairness and justice, the law compels performance of a legal and moral duty to pay, and the damages analysis is based on principles of equity, not contract." *Paffhausen v. Balano*, 1998 ME 47, ¶ 6, 708 A.2d 269, 271 (citations and internal quotation marks omitted).  "Damages in unjust enrichment are measured by the value of what was inequitably retained.  In *quantum meruit*, by contrast, the damages are not measured by the benefit realized and retained by the defendant, but rather are based on the value of the services provided by the plaintiff." *Id*. ¶ 7, 708 A.2d at 271 (citations omitted).

"A valid claim in *quantum meruit* requires: that (1) services were rendered to the defendant by the plaintiff; (2) with the knowledge and consent of the defendant; and (3) under circumstances that make it reasonable for the plaintiff to expect payment." *Id*. ¶ 8, 708 A.2d at 271 (citation and internal quotation marks omitted).  "While the formalities of an express contract are not a prerequisite to recovery in *quantum meruit*, there must be a reasonable expectation on the part of the claimant to receive compensation for his services and a concurrent intention of the other party to compensate him." *Id*. ¶ 9, 708 A.2d at 272 (citation and internal quotation marks omitted).

"To establish a claim for unjust enrichment, three elements must be proved: [One] a benefit conferred upon the defendant by the plaintiff; [two] an appreciation or knowledge by the defendant of the benefit; and [three] the acceptance or retention by the defendant of the benefit under such circumstances as to make it inequitable for the defendant to retain the benefit without payment of its

29

value." *Bowden v. Grindle*, 651 A.2d 347, 350-51 (Me. 1994) (citations and internal quotation marks omitted).

Cashman is correct that, under Maine law, the existence of an express contract between the parties does not necessarily bar a claim for *quantum meruit* damages. *See* Plaintiff's S/J Opposition at 6-9; *see also, e.g., Uncle Henry's Inc. v. Plaut Consulting Co.*, 399 F.3d 33, 46 (1st Cir. 2005) ("[A] viable quantum meruit claim can co-exist with an express contract.") (applying Maine law); *Combustion Eng'g, Inc. v. Miller Hydro Group*, 812 F. Supp. 260, 262 (D. Me. 1992), *aff'd*, 13 F.3d 437 (1st Cir. 1993) ("Defendant argues that Plaintiff cannot obtain equitable relief when a valid written agreement covers the construction work at issue. Although other states have established such a principle, the Maine Law Court has not set forth such an absolute rule.") (citations and footnote omitted); *Prest v. Town of Farmington*, 104 A. 521, 524-25 (Me. 1918) (permitting plaintiff to recover costs for performance of work beyond scope covered in contract). In fact, as Cashman points out, *see* Plaintiff's S/J Opposition at 8-9, in *Abington Constructors, Inc. v. Madison Paper Indus.*, No. 99-1593, 2000 WL 620203 (1st Cir. Mar. 21, 2000), a case similar to this one, the First Circuit upheld the trial court's ruling that, pursuant to Maine law, the plaintiff contractor was entitled to recover *quantum meruit* damages from the defendant hydroelectric-facility owner for work the defendant had directed the plaintiff to perform that was outside the scope of the parties' construction contract, *Abington*, 2000 WL 620203, at *4-*7.

At oral argument, Pipeline's counsel agreed that *Abington* stands for the proposition that, in some cases, a claim for *quantum meruit* may exist alongside an express contract; however, he sought to distinguish *Abington* on the basis that the instant contract, which includes provisions prescribing the methodology by which Cashman was to seek any extra compensation, fully addressed the alleged "extra" work performed by Cashman, effectively displacing any *quantum meruit* claim. He further

30

contended that recognition of a *quantum meruit* claim in these circumstances would render a contract's extra-work provisions a nullity, robbing an owner such as Pipeline of the benefit of its bargain and undermining its ability to manage projects such as this.

From all that appears, the express contract at issue in *Abington* contained no provision addressing extra pay for extra work (such as a change-order clause), or at least, no such provision is discussed. *See generally Abington*, 2000 WL 620203. Nonetheless, my research reveals that even the existence of an express change-order or extra-work provision does not necessarily foreclose a claim for *quantum meruit. See Runnells v. Quinn*, 2006 ME 7, ¶ 9, 890 A.2d 713, 716 (although home-construction contract required that all changes to the contract involving extra costs be in writing, provision could be modified by agreement of the parties; "Such a provision does not preclude a contractor from recovering for work that was fully performed."); *Granger N., Inc. v. Cianchette*, 572 A.2d 136, 139 (Me. 1990) ("Although the change orders were not executed in accordance with the terms of the written contract, Granger, as the contractor, is not precluded as a matter of law from recovering for work that was fully performed."); *see also, e.g., Acme Contracting, Ltd. v. TolTest, Inc.*, No. 07-10950, 2008 WL 1990780, at *12 (E.D. Mich. May 5, 2008) ("[T]he 01-Contract's provision requiring written change orders for additional work does not bar [*quantum meruit*] relief in this case because the facts clearly show that Toltest waived that requirement because it was aware of the requirement but nevertheless verbally ordered the changes."); *In re R & D Contracting, L.L.C.*, 383 B.R. 890, 899 (Bankr. E.D. Mich. 2008) (pursuant to Michigan law, "a construction contract provision requiring that any extra work be ordered by the owner's architect in writing may be waived, either expressly by the parties, or impliedly by statements or by a course of acts and conduct which amounts to an estoppel, or by so neglecting and failing to act as to induce a belief that there is an intention or purpose to waive") (citation and

internal quotation marks omitted); *Daystar Sills, Inc. v. Anchor Invs., Inc.*, C.A. No. 06L-05-026(MJB), 2007 WL 1098129, at *4 (Del. Super. Ct. Apr. 12, 2007) ("Generally, *quantum meruit* is considered only if the relationship of the parties is not governed by an express contract. Delaware courts have recognized, however, that the facts may establish that the provisions of the contract relating to change orders have been waived by the parties. Where such a finding is made, the court may award sums based on *quantum meruit*.") (footnotes omitted).

The parties sharply dispute whether, in this case, Pipeline directed Cashman to perform work outside the scope of the contract.[47]  Nonetheless, a trier of fact viewing the evidence in the light most favorable to Cashman could find that it did.  Specifically, a trier of fact could find that (i) Cashman rendered services to Pipeline outside the scope of the contract (*e.g.*, the creation of a channel deeper than contemplated and the redredging of areas previously declared cleared), (ii) with Pipeline's knowledge and consent (Pipeline directed performance of that work), (iii) in circumstances that made it reasonable for Cashman to expect payment (Cashman reasonably viewed certain of the work it was directed to perform as beyond the scope of the contract and warned Pipeline, prior to recommencement of work during the 2006 dredging season, that in its view it already had substantially completed performance).[48]  Cashman thus raises a triable issue as to whether its case meets the elements of *quantum meruit*.  A trier of fact crediting Cashman's version of events also could find that, in view of Pipeline's explicit direction to Cashman to undertake

---

[47] For example, at oral argument, Pipeline's counsel described this case as not remotely similar to the classic *quantum meruit* case in which a homeowner directs a contractor to add two additional windows to her house. By contrast, Cashman's counsel characterized this case as very similar, suggesting that Pipeline's direction to do considerable additional digging paralleled the prototypical homeowner's direction.

[48] To make out the third element of a *quantum meruit* claim (that the circumstances made it reasonable for the plaintiff to expect payment), a plaintiff need not show that the defendant subjectively intended to pay for the work. *See, e.g., Paffhausen*, 1998 ME 47, ¶ 10 n.5, 708 A.2d at 272 n.5 ("[I]f the recipient of services should, as a reasonable person, have understood that the performer expected compensation, the actual belief of the recipient as to such matters is immaterial.") (citations and internal quotation marks omitted).

extracontractual work, Pipeline waived, or is estopped from relying on, strict compliance with the contract's extra-work provisions.

The court accordingly should deny Pipeline's bid for summary judgment as to Count II.

### 3.  Count III: Unjust Enrichment

I reach a different conclusion with respect to Cashman's unjust-enrichment claim.  While some of Cashman's authorities support the proposition that a *quantum meruit* claim can coexist alongside an express contract, none supports the proposition that such is the case with respect to an unjust-enrichment claim.  *See* Plaintiff's S/J Opposition at 6-9; *see also Uncle Henry's*, 399 F.3d at 46 (*quantum meruit* claim); *Abington*, 2000 WL 620203, at *5-*7 (*quantum meruit* claim); *Miller Hydro*, 812 F. Supp. at 262-63 (*quantum meruit* claim); *Forrest Assocs. v. Passamaquoddy Tribe*, 2000 ME 195, ¶ 10, 760 A.2d 1041, 1045 (no coexisting express contract); *A.F.A.B., Inc. v. Town of Old Orchard Beach*, 610 A.2d 747, 749-50 (Me. 1992) (no coexisting express contract); *Prest*, 104 A. at 524-25 (*quantum meruit* claim); *Saunders v. Saunders*, 38 A. 172, 174 (Me. 1897) (no coexisting express contract); Andrew M. Horton & Peggy L. McGehee, *Maine Civil Remedies* § 11.2(a)(2) at 249-50 (3d ed. 1996) (*quantum meruit* claim); J.R. Kemper, Annotation, *Building and Construction Contracts: Right of Subcontractor Who Has Dealt Only With Primary Contractor To Recover Against Property Owner in Quasi Contract*, 62 A.L.R.3d 288 (1975) (no coexisting express contract).

What is more, as Pipeline suggests, *see* Defendant's S/J Reply at 4, the Law Court has affirmatively stated that unjust-enrichment claims arise when no contractual relationship exists, *see, e.g., Passamaquoddy Tribe*, 2000 ME 195, ¶ 14, 760 A.2d at 1046 ("Unjust enrichment . . . permits recovery for the value of the benefit retained when there is no contractual relationship, but when, on the grounds of fairness and justice, the law compels performance of a legal and moral duty to

pay[.]") (citation and internal quotation marks omitted); *Top of the Track Assocs. v. Lewiston Raceways, Inc*., 654 A.2d 1293, 1296 (Me. 1995) ("We have previously stated that unjust enrichment describes recovery for the value of the benefit retained when there is no contractual relationship, but when, on the grounds of fairness and justice, the law compels performance of a legal and moral duty to pay.  Here, because the contract between the parties forecloses the maintenance of TOTA's claim against Raceways for unjust enrichment, we affirm the judgment in favor of Raceways.") (citation and internal quotation marks omitted).

Cashman has cited no authority indicating that, under Maine law, a claim for unjust enrichment can coexist with an express contract.  Accordingly, Pipeline is entitled to summary judgment as to Count III.

### 4. Count V: Unconscionability; Breach of Duty of Good Faith, Fair Dealing

As Cashman points out, *see* Plaintiff's S/J Opposition at 12, there are two species of unconscionability claims: procedural and substantive, *see, e.g., JOM, Inc. v. Adell Plastics, Inc*., 151 F.3d 15, 28 (1st Cir. 1998), *vacated in part on reh'g on other grounds*, 193 F.3d 47 (1st Cir. 1999). Procedural unconscionability emanates from the circumstances surrounding adoption of a contract. *See, e.g., Stenzel v. Dell Inc*., No. Civ.A. CV-03-323, 2004 WL 1433657, at *2 (Me. Super. Ct. Mar. 11, 2004), *aff'd*, 2005 ME 37, 870 A.2d 133.  The concept is "broadly conceived to encompass not only the employment of sharp practices and the use of fine print and convoluted language, but a lack of understanding and an inequality of bargaining power."  *American Airlines, Inc. v. Wolens*, 513 U.S. 219, 249 (1995) (citation and internal quotation marks omitted) (Stevens, J., concurring in part and dissenting in part).  An agreement is substantively unconscionable if its terms are so one-sided as to shock the conscience.  *See, e.g., Barrett v. McDonald Invs., Inc*., 2005 ME 43, ¶ 36, 870 A.2d 146, 156 (Alexander, J., concurring); *Bither v. Packard*, 98 A. 929, 933 (1916).

Cashman identifies no specific provision of the instant contract as substantively unconscionable. *See* Plaintiff's S/J Opposition at 12-16. It does contend that Pipeline knew, by virtue of Moffat & Nichols' report, that the contract lacked detail and was ambiguous, potentially leading to cost overruns and disputes with the contractor. *See id.* at 13-15. However, assuming that a generalized claim of ambiguity suffices to make out a cause of action for substantive unconscionability, Moffat & Nichols warned that this lack of precision could hurt Pipeline's interests, not those of the contractor. Cashman's evidence and argument falls short of delineating a triable issue of substantive unconscionability.

In support of its claim of procedural unconscionability, Cashman asserts that (i) Pipeline drafted the contract and required Cashman to sign it at the time it submitted its bid, and (ii) Pipeline administered the contract in an unconscionable fashion, demanding a level of perfection beyond its ability to measure and unrealistic to achieve in Maine's tidal waters. *See id.* at 12-13. As Pipeline points out, *see* Defendant's S/J Motion at 6, the measure of unconscionability is taken at the time of execution of a contract, *see, e.g., Richardson v. Diringis*, Civil Action Docket No. CV-97-14, 1999 Me. Super. LEXIS 38, at *7 (Me. Super. Ct. Feb. 2, 1999) (if a contract "is unconscionable at the time the contract is made a court may refuse to enforce the contract") (quoting Restatement (Second) of Contracts § 208); *L.L. Bean, Inc. v. Metro-Autospan, Inc*., Civil Action Docket No. CV-88-1362, 1989 Me. Super. LEXIS 250, at *11-*12 (Me. Super. Ct. Dec. 11, 1989) ("[W]hen determining whether an entire contract or any of its parts is so unconscionable as to justify its judicial rescision or cancellation, the matter will not be judged in hindsight but by the situation as it existed at the time the bargain was struck.") (citations and internal quotation marks omitted). Cashman's contract-administration complaints hence cannot shore up its claim of unconscionability.

Cashman's remaining point, that Pipeline drafted the contract and required Cashman to sign it at the time of bid submission, does not in itself raise a triable issue of procedural unconscionability, particularly in this commercial context. Cashman does not state, and one cannot reasonably infer from the facts it highlights, that it was afforded no opportunity to review the terms of the contract or was unable simply to walk away from the deal and pursue the next dredging job. *Compare, e.g., Sherr v. Dell, Inc*., 05 CV 10097 (GBD), 2006 U.S. Dist. LEXIS 51864, at *11-*12 (S.D.N.Y. July 27, 2006) ("The unconscionability analysis has both a procedural and a substantive component. Procedurally, courts look at the circumstances surrounding the . . . clause's adoption. A party must have had 'no real choice' except to enter into the contract in order to prove a disparity in bargaining power surrounding the clause's adoption. . . . Plaintiff has not met his burden. Under the circumstances, plaintiff could have chosen not to enter into the Agreement with defendant. He could have chosen to buy a computer from another company.") (citations omitted) (applying Texas law); *see also JOM, Inc.*, 151 F.3d at 28 ("Since the doctrine of unconscionability primarily relates to the unequal bargaining power between a merchant and a non-merchant consumer, it is not surprising that it is exceedingly rare that a clause in a commercial contract between merchants is deemed unconscionable.") (citations omitted); *L.L. Bean*, 1989 Me. Super. LEXIS 250, at *11 ("Limitations on consequential damages in commercial, as opposed to consumer transactions, are rarely considered unconscionable.").

Pipeline hence is entitled to summary judgment with respect to Cashman's unconscionability claim.

This leaves Cashman's claim for breach of the duty of good faith and fair dealing. As Pipeline correctly observes, *see* Defendant's S/J Reply at 5, the Law Court has stated that it declines to extend that duty beyond the confines of transactions governed by the UCC, *see, e.g., First NH*

*Banks Granite State v. Scarborough*, 615 A.2d 248, 251 (Me. 1992) ("The U.C.C. imposes a duty of objective good faith in certain situations.  We, however, have not extended that duty beyond its statutory scope.") (citations omitted).  Cashman musters authority, *see* Plaintiff's S/J Opposition at 15-16, indicating that (i) the Law Court has recognized a duty of good faith and fair dealing in the context of insurance contracts, *see County Forest Prods., Inc. v. Green Mountain Agency, Inc*., 2000 ME 161, ¶ 35, 758 A.2d 59, 68, and (ii) Maine courts have considered a party's good faith and fair dealing relevant to the questions whether that party substantially performed, or materially breached, a contract, *see, e.g., Associated Builders, Inc. v. Coggins*, 1999 ME 12, ¶ 7, 722 A.2d 1278, 1281; *Oak Ridge Builders, Inc. v. Howland*, No. CV-03-17, 2006 WL 2959690, at \*5 (Me. Super. Ct. Oct. 6, 2006).  However, none of its authorities stands for the proposition that the Law Court has recognized a free-standing claim for breach of an implied covenant of good faith and fair dealing in a context such as the instant one, and my own research reveals no case indicating that it has.

Pipeline accordingly is entitled to summary judgment as to Count V.

### III.  Conclusion

For the foregoing reasons, I **DEFER** by agreement of the parties ruling until trial on three of Cashman's motions in *limine* (the *Limine* Motion/Settlement, the *Limine* Motion/Insurance, and the *Limine* Motion/Webster), **GRANT** the *Limine* Motion/Contract Terms, **DENY** the *Limine* Motion/Surveying, and recommend that the court **GRANT** Pipeline's motion for summary judgment as to Counts III (unjust enrichment) and V (unconscionability and breach of the duty of good faith and fair dealing) and **DENY** its motion for summary judgment as to Count II (*quantum meruit*).

### *NOTICE*

*A party may file objections to those specified portions of a magistrate judge's report or proposed findings or recommended decisions entered pursuant to 28 U.S.C. § 636(b)(1)(B) for which <u>de novo</u> review by the district court is sought, together with a supporting memorandum and request for oral argument before the district judge, if any is sought, within ten (10) days after being served with a copy thereof.  A responsive memorandum and any request for oral argument before the district judge shall be filed within ten (10) days after the filing of the objection.*

*Failure to file a timely objection shall constitute a waiver of the right to <u>de novo</u> review by the district court and to appeal the district court's order.*

Dated this 18th day of June, 2008.

<u>/s/  John H. Rich III</u>
John H. Rich III
United States Magistrate Judge